COMMERCIAL BREWING COMPANY *vs.* THOMAS McCORMICK.

Suffolk.    December 4, 1916. — January 5, 1917.

Present: RUGG, C. J., LORING, CROSBY, PIERCE, & CARROLL, JJ.

*Corporation,* Officers and agents. *Equity Jurisdiction,* To compel accounting for illegal expenditure of funds of corporation. *Contract,* Implied, Of indemnity.

A corporation is not bound by the action of a majority of its board of directors, intentionally kept secret by them from the minority of the board, in arranging for the purchase by a bank of shares of stock in the corporation necessary to assure their control of it and a continuance of their policies in the face of threatened opposition, for a guaranty of the bank against loss by the treasurer of the corporation, one of the majority of the board, and for the holding of such shares in the name of a friend of the treasurer and an employee of the bank who indorsed them in blank and placed them in the treasurer's possession and gave the treasurer proxies for voting upon them until an opportune time for the corporation openly to acquire and pay for the stock, although such conduct of the majority of the board was beneficial to the corporation.

Nor do the circumstances above described give rise to an implied promise on the

part of the corporation to save the treasurer harmless upon his guaranty given to the bank.

And if a later board of directors of the corporation, a majority of whom are the same persons who carried out the plan above described but a minority of whom are in ignorance of the foregoing facts, by a vote empower the same treasurer to purchase the stock "now held by" the employee of the bank without naming a price, such vote cannot be construed as a ratification of the former action of the majority of the board nor as giving to the treasurer authority to pay for such stock a price, far in excess of the market value of the stock, which equals the price which was paid by the bank and interest on the sum advanced by the bank.

Under the circumstances above described, the corporation may maintain a suit in equity to compel the treasurer to account to it for the excessive price thus paid for the stock and to repay to it so much of the amount so paid as was in excess of the fair market value of the stock at the time of the purchase which was legally authorized.

BILL IN EQUITY, filed in the Superior Court on January 6, 1915, by a corporation for an accounting as to a sum of money paid by the defendant as treasurer of the plaintiff corporation for the purchase of shares of the capital stock of the plaintiff at a price greatly in excess of their market value.

In the Superior Court the suit was heard by *Wait*, J., who found the following among other facts:

From the time of the organization of the plaintiff in 1907, a few stockholders had been dissatisfied with the management, which was in the hands of the defendant and business associates in the corporation who were in accord with him in regard to the policies of the corporation. If the policies which the defendant desired to see carried out were to prevail, it was important that he and his friends should control a majority of the stock at the time of the annual meetings. Care was needed constantly to maintain such a majority.

In 1908, one Petts, one of the dissatisfied stockholders, was making an effort to secure shares of stock in order to be able successfully to oppose the influence and policies of the defendant. Information in regard to this reached the defendant and his friends in the directorate; and they also learned that there was an opportunity to head off the acquisition of stock by Petts through the purchase of certain blocks of stock. After informal consultation, it was decided to buy in these blocks of stock. Six hundred and ten shares were secured in accordance with this decision at different times between April and October, 1908. They were paid for in the

following way: the defendant and one Heffernan, and possibly one Doherty, went to the National Shawmut Bank and explained a desire to get stock for the corporation. The defendant guaranteed the National Shawmut Bank, and it, with its money, purchased the stock from the owners, paying the prices which the defendant directed, and taking the certificates which came to it in the form of "street certificates." These it later transferred into the name of Henry F. Smith, an employee of the bank and a friend, at that time, of the defendant. The negotiations with the former owners and the determination of the price to be given for the stock were carried out by the defendant or under his direction, and he notified the bank what and whom to pay. Various prices were paid for this stock; some of them rather more than the market value of the stock, but, in the main, not more was paid for these six hundred and ten shares than the price which then, owing to Petts' operations, could have been obtained for the stock in the market. This stock continued to remain in the name of Smith, who, however, indorsed the certificates in blank and handed them to the defendant, and the latter kept them in his safe deposit box. Proxies were given to the defendant, and the six hundred and ten shares were voted for directors and officers in sympathy with the policies of the defendant and his friends. No note nor obligation was given to the bank by the corporation. The transaction was to be kept secret until an opportune time came for the corporation openly to acquire the stock. The originators of the plan intended that the corporation eventually should pay for the stock and own it, and believed this to be a benefit to the corporation. There was no formal action of the directors, and it is possible that one or two of them did not know of the plan and its carrying out; but McCormick, Heffernan, Doherty and others, — a majority of the board of directors, — did know and approve of the plan.

The management was working in the interest and for the benefit of the corporation, and the maintenance of their policies was advantageous to the corporation.

In 1912 the defendant, desiring to sever his official relations with the corporation, wished to get relief from his guarantee to the National Shawmut Bank; he did not desire to own the Smith stock personally, and he brought up the matter of carrying out

the rest of the transaction in regard to the Smith stock in conversation with the directors familiar with it.

At a meeting of the directors on November 13, 1912, five of the seven directors were present, — Heffernan, Gately, Logan, the defendant and Sullivan. All but Sullivan had been directors since the organization of the corporation, and Heffernan, the defendant and Logan were familiar with this transaction. Gately was a "nominal" director only. Sullivan, at that time and now the president of the corporation, was a large owner of stock, all of which he had purchased later than 1910 at a less price than the prices paid by the National Shawmut Bank for the Smith stock, and he was ignorant of the Smith transaction. The absent directors were Doherty and Petts, of whom Doherty was familiar with the Smith transaction and Petts was the man it had been directed against.

After some discussion, which, however, did not inform Sullivan or Gately in regard to the early history of the matter, but in which the defendant stated that it would be a good idea to have the stock in the treasury, as it would lessen the outstanding stock and make dividends more probable, the following vote, prepared by Logan and offered by Gately, was passed:

"It was moved by Mr. Gately and seconded by Mr. Sullivan that the treasurer, Thomas McCormick, be authorized and empowered to purchase in behalf of the Commercial Brewing Company the six hundred and ten shares of stock of said company now held by Henry F. Smith, and place the same in the treasury as treasury stock, and it was so voted."

Some six months later, on June 14, 1913, the defendant carried out this vote and made the purchase. He paid to the National Shawmut Bank $34,126.75, the amount it paid originally for the stock, with interest to that date, — a sum considerably larger than the fair market price of the stock on the day of this purchase. This purchase was made by the defendant in part with money obtained by him by discounting the notes of the corporation at the International Trust Company. These notes were signed by him as the treasurer of the corporation. He did not inform the board of directors what price he was about to pay for the Smith stock. The by-laws of the corporation provided that all notes should be signed by the president and the treasurer jointly, and that no

money for extraordinary purposes should be borrowed without obtaining the consent of the board of directors.

As a result, the defendant was protected on his guarantee and had had the benefit of the stock for the control of the corporation from the time of the purchase by the bank until the purchase by the corporation. The possession of these six hundred and ten shares by the defendant was not enough to maintain a control of the corporation unless other shares, which he did not control, voted in accordance with his policies.

The transaction was probably of real benefit to the corporation, and the defendant's purpose was to benefit the corporation and to secure his own way, rather than to make money or to gain pecuniary advantage for himself out of the transaction.

The entire transaction was carried out in accordance with the understanding of those who had planned it originally; and they, as already stated, were a majority of the directors of the corporation.

The defendant resigned as treasurer on June 26, 1913. Some time after the purchase, and after his resignation, Doherty, learning for the first time what had been paid for the stock, immediately objected and brought the matter again to the attention of the directors and stockholders by a letter addressed to them and dated August 29, 1914, with the result that this bill in equity was begun.

The judge stated: "I am unable from the evidence and the records of the corporation to find that any action was ever taken by the board of directors authorizing the original purchase or approving of the plan; and I find and rule that the original acquisition by Smith was not a purchase by the corporation. The vote of the directors in November, 1912, was valid, and was not procured by any undue influence of Mr. McCormick or his friends. I construe that vote to authorize and require a purchase at the fair market value of the stock at the date of the purchase by the corporation thereunder, although three of the five who voted for it may have intended it to authorize a purchase for the price originally given with carrying charges.

"I find the fair market value at the time of the purchase to have been $35 per share."

By order of the judge a final decree was entered directing the defendant to pay to the plaintiff the sum of $12,776.75, being the

difference between $21,350, the fair market value at which he was authorized to purchase the stock, and $34,126.75, the amount which he actually paid to the National Shawmut Bank for the stock, together with interest from June 14, 1913, amounting in all to $14,788, and awarding costs to the plaintiff. The defendant appealed.

F. L. Norton, (G. H. Brown with him,) for the defendant.

J. A. Curtin, (A. S. Allen with him,) for the plaintiff.

PIERCE, J.   The purchase of stock by the National Shawmut Bank in 1908 and its transfer to Henry F. Smith, — an employee of the bank and friend of the defendant, — at the request of the defendant with the individual approval of a majority of the persons who with him constituted the directorate of the Commercial Brewing Company, the indorsement in blank and delivery of stock and proxies to the defendant for the purpose of ensuring the annual election of a board of directors whose votes would support and sustain him in retaining the control of the management and the direction and determination of the policies of the corporation, until an opportune time came for the corporation openly to acquire and pay for the stock, were inoperative, — even if conceded to be beneficial to the corporation, — to bind the corporation to pay for the stock on demand and tender of the certificates or to raise an implied promise binding the corporation to save the defendant harmless upon his guarantee of the purchase price to the bank, for the reason that the purchase, transfers and plan were always intentionally kept secret from the minority of the board of directors and were assented to and approved by the majority of the board acting individually and not collectively. Buttrick v. Nashua & Lowell Railroad, 62 N. H. 413. National Bank v. Drake, 35 Kans. 564. Cook on Corporations, (7th ed.) § 713.

The vote of the board of directors in 1912, whereby the treasurer, the defendant, was authorized and empowered to purchase the stock "now held by Henry F. Smith," was not in terms a ratification of the purchase of stock and of the plan to use it in furtherance of the policies of the defendant until an opportune time came to transfer it to the corporation; nor can the vote by implication be held to ratify and adopt the irregular action of the individual majority members of the board of 1908, because a

minority of the board authorizing the purchase of the Smith stock were ignorant of, and intentionally kept in ignorance of, the purchase and the scheme and plan for the use and final disposition of the stock assented to, adopted and finally carried out by the individual members, who in 1908 as in 1912 constituted a majority of the members of the board of directors.

A majority only of the board of directors knew that since 1908 the treasurer, the defendant, had held the legal title to the stock standing on the stock books of the corporation in the name of Henry F. Smith by transfer and delivery of the certificates of stock indorsed in blank by Smith. St. 1910, c. 171, § 1. *Bellows Falls Power Co.* v. *Commonwealth,* 222 Mass. 51, 59.

The vote, presumptively, only authorized a purchase of the stock described at the fair market value, and the concealment of the fact that it was owned by the treasurer rebuts any inference that it was intended thereby to pay the price of its purchase in 1908 and interest thereon. *Malden & Melrose Gas Light Co.* v. *Chandler,* 209 Mass. 354. It is not disputed that the treasurer, the defendant, purchased the stock under the authority of the vote paying therefor $12,776.75 in excess of its fair market value, nor is it denied that such act was illegal if not excused and warranted by the facts and circumstances disclosed.

*Decree affirmed with costs.*